MATILDA BROWN *et al.* Appellees, *vs.* JENNETT A. BROWN *et al.*—(GEORGE K. KARAMBELOS *et al.* Appellants.)

*Opinion filed June 22, 1916—Rehearing denied October 5, 1916.*

1. CONTRACTS—*subsequent rise in value of property not ground for refusing to enforce contract of sale.* A material rise in value of acre property soon after a contract for its sale was made, due to a demand for residence lots following an improvement of transportation facilities between the property and the business district of the city, is not ground for setting aside the contract or refusing to enforce it on the cross-bill of the proposed purchaser, where the contract price was a fair one at the time the contract was made.

2. SAME—*what does not show want of mental capacity.* Failure of the vendor in a contract of sale to anticipate a large increase in the value of his land which arose soon after contracting for its sale does not show want of mental capacity, even though the vendor had been insane when a young man and was thereafter subject to spells of despondency, during one of which, about a week after making the contract, he committed suicide, where the price he obtained for his land, which he had used for a truck farm, was $3300 per acre, which at the time was the best offer he had received and was a fair price.

3. SAME—*what does not show abandonment of the contract.* Where the owner of land dies about a week after making a contract for its sale and before the contract is carried out, the fact that the attorney for the proposed purchasers and the attorney for the widow and minor children of the deceased owner talk over various ways of carrying out the contract and discuss the matter of a guardian's sale does not show abandonment of the contract.

4. SAME—*when proposed purchasers cannot be said to be in default.* Proposed purchasers in a contract for the sale of land, made only a week before the proposed vendor's death, cannot be said to be in default before the appointment of an administrator for the deceased's estate, even though they did not make the payments at the time specified in the contract, where they were at all times ready and willing to carry out the contract but were delayed because of the fact that the deceased left minor heirs, and that the attorneys for both parties were undecided as to how to proceed to carry out the contract, which the widow and heirs then professed to be willing to stand by.

APPEAL from the Superior Court of Cook county; the Hon. DENIS E. SULLIVAN, Judge, presiding.

IRWIN R. HAZEN, and LEROY V. PENWELL, for appellants.

CHYTRAUS, HEALY & FROST, for appellees.

Mr. JUSTICE FARMER delivered the opinion of the·court:

Appellees Matilda and Harold E. Brown (hereafter called complainants) filed their bill in chancery in the superior court of Cook county against appellees Jennett A. Brown and Benny V. Brown, minor heirs and children of Charles E. Brown, deceased, and against appellants. The bill prayed for the partition of real estate particularly described, situated at or near the junction of Lawrence and Elston avenues, in Chicago, Cook county, Illinois, and for the assignment of dower and homestead therein, and further prayed for the cancellation and removal, as a cloud upon the title to about five and one-half acres of the said real estate, of a certain instrument in writing executed by Charles E. Brown, deceased, who owned the land in his lifetime, and who was the husband of appellee Matilda Brown and father of the other appellees, which instrument was delivered to the appellants July 5, 1912. The written instrument, which was a contract for the sale of the five and a fraction acres of the land described in the bill by said Charles E. Brown to appellants, was recorded in the recorder's office of Cook county by appellants July 11, 1912, and is as follows:

"CHICAGO, ILL., *July 5, 1912.*

"I have this day received from George K. Karambelos, Peter A. Karambelos, Gust G. Polites, Christ P. Trohatos and Gregory Monenevasites the sum of $500, earnest money, to bind the bargain for the sale by me to them of the following described real estate: Lot 3 in James H. Rees' subdiv. of the S. W. ¼ of Sec. 10, T. 40, R. 13, E. of the 3d P.M., less the east 6.97 chains thereof, the lot hereby sold being the balance of said lot 3, excluding therefrom lot 4 of a partition of part of lots 2 and 3, J. H. Rees' subn. of the S. W. ¼ of Sec. 10, T. 40, north, R. 13, east, (being the east 6.97 chains of said lot 3,) containing about 5.434 acres.

"The terms of the sale by me to said purchasers of said real estate is as follows: The said purchasers are to pay $18,000 for said real estate. I will furnish them a complete abstract of title to said property as soon as I can obtain the same from the Chicago Title and Trust Company. If, on examination by their attorney, the title to said property is not found good in me, then I will return to them the above earnest money, $500, by them paid, and all agreements between us are ended. If the title is found good, then not exceeding thirty days from this date said purchasers shall pay me the further sum of $5500 in cash. Upon receipt of said further sum of $5500 cash I agree to execute and deliver to them a warranty deed to said property, executed by myself and wife, and the said purchaser and their wives are to at the same time to execute and deliver to me a trust deed to secure the unpaid part of the purchase price, $12,000, and said trust deed to secure four notes, each for $3000, due, respectively, one, two, three and four years from the date of said warranty deed, with interest on each thereof at the rate of 6% per annum until paid, said purchasers to execute and deliver to me all of said notes at the time said warranty deed is delivered. This sale is made free and clear of all liens and incumbrances, of which there are none now on said property.

"If this sale is completed I shall have the right to remove from said property all buildings now thereon, except the dwelling house and one wagon shed, and all my personal property, and not to exceed one-half dozen small trees and all bushes thereon, and I shall have the right to remain in possession of said property for one year from the date of said warranty deed, at a rental of $10 to be paid by me to said purchasers. The purchasers are to pay all taxes which become payable on said property after the date hereof.

CHARLES E. BROWN."

The allegations of the bill upon which it was sought to have the contract of sale set aside as a cloud upon the title were, that said Charles E. Brown was not mentally capable of entering into a contract of sale at the time the instrument bears date; that the consideration mentioned in such contract ($18,000) was grossly inadequate, such property then being worth $25,000, and such fact being then known to appellants; that the purchasers did not comply with the terms of the contract as to the time of performance and payment of taxes, and further, that now, since the time for the performance of the contract by the purchasers named therein is past, the value of the property having

greatly increased in value, they are seeking, contrary to equity and good conscience, to acquire title to such property by demanding performance of the contract after a lapse of more than a year from the time it should have been performed.

. Appellees Jennett A. Brown and Benny V. Brown being minors, an answer was filed for them by a guardian *ad litem.* Appellants filed their answer to the amended bill of complaint March 18, 1914, denying each and every allegation of the bill upon which appellees based their right to have the contract set aside, and averring they had at all times been ready, able and willing to carry out the provisions of the contract for the purchase of the land. Appellants also filed a cross-bill, in which they asked for the specific performance of the contract in question and alleged that the delay in the final consummation of the sale was chargeable to appellees and not to appellants.

Upon the issues joined the cause was referred to a master in chancery to hear the testimony and report the same, together with his conclusions thereon. The master did not find that Charles E. Brown was mentally incapable of understanding the contract at the time he signed it. The master recites that in 1872, when Brown was seventeen years of age, he was adjudged insane and committed to the insane asylum at Dunning, where he was confined three or four months, and that after his release he was not judicially declared restored to reason; that during the later years of his life he was melancholy, nervous, at times a victim of hallucinations, and his conduct in some respects was erratic. The master's finding upon this subject further recites that Brown was not shown to have had any business experience except that gained by raising and selling the produce from his land, which he was capable of attending to, but says it is doubtful whether Brown had mental capacity sufficient to understand and appreciate the changes which were taking place in development in the locality of his property or

to form a reasonable judgment as to the effect improvement in transportation would have on real estate values. From these considerations the master concludes that the discretion of the court should be exercised against specific performance of the contract. Upon these grounds, and these only, the master recommends that the cross-bill be dismissed and the relief prayed in the original bill granted. He recommended that the widow and heirs of Charles E. Brown be decreed to pay the cross-complainants the $500 earnest money, with interest at five per cent per annum from July 5, 1912.

The chancellor overruled exceptions to the master's report and entered a decree granting the relief prayed in the original bill and dismissing the cross-bill but made findings of fact entirely different from those found by the master. He found, as did the master, that the property was fairly worth $25,000 at the time the contract was made. The decree also found that at that time, and at the time of the death of Charles E. Brown, which resulted from suicide July 12, 1912, he was insane and wholly incapable of making a valid, legal contract. The decree further finds that cross-complainants have not kept the agreements to be kept and performed by them according to the terms of the contract; that Matilda Brown, administratrix, has been and was willing at all times to carry out the contract until October 9, 1913; that from the day the contract was made until said October 9 cross-complainants professed a readiness and willingness to carry out the contract but refused to do so and are not entitled to have it specifically performed.

The finding that Charles E. Brown was insane or mentally incapable of understandingly making the agreement is not sustained by the evidence. When a boy seventeen years of age he was adjudged insane and committed to the Dunning asylum, where he remained two or three months, when he was discharged. There was no adjudication that he had been restored to reason, but he grew up to manhood, mar-

ried, raised a family of three children, and successfully and intelligently managed and conducted his business of truck farming until his death. The most the evidence on this subject tends to show is that he was somewhat eccentric and at times moody and apparently depressed in spirits. His death by suicide probably occurred during one of his periods of depression, but it was not shown by the proof he was insane or incapable of understandingly transacting business at any time after his discharge from the Dunning asylum. He may not have foreseen the rise in value of the property that soon afterwards occurred, or if he had known what improvements would soon be made in travel facilities between the property and the business district of the city he might not have had the sagacity to see the full extent to which it would increase the value of his property, but this was not lack of mental capacity that affected the validity of the contract. Appellees do not really attempt to justify that part of the decree, and say that outside of the changed character of the property and its increase in value, "the important controversy in this case is whether or not appellants abandoned the contract of July 5, 1912, when they insisted, through their attorney, Mr. Sinden, that a new and different title should be given them by the guardian of the minor heirs of Charles E. Brown."

Nothing appears in this record, in connection with the character of the property or its increase in value, to justify the conclusion that the contract was, when made, unfair, illegal or inequitable. The property was being used by the owner for a truck farm and had been so used many years. He must have understood that its value was not determined by uses to which the land had been previously devoted, for the price he contracted to sell it for was about $3300 per acre. We think the weight of the proof shows that was a reasonable, fair cash value for the property at that time. The owner had advertised it for sale for some time before the contract was made with appellants, and no one

but they up to that time had been willing to offer the sum they agreed to pay. Before and at the time the contract of sale was made there was one street car line in operation between the property and the city, upon which cars were run at intervals of every half-hour. Some two months after the agreement to sell was made the number of cars was increased, and the following year they were further increased so as to run at fifteen and ten minute intervals. In the year 1913 the city council passed ordinances for the improvement and extension of Elston avenue, which, when completed, would furnish additional and better street car service for travel between this property and the city. Owners of property in the vicinity began to subdivide it into lots for residence purposes, and the sale value of such property increased greatly. The property here in controversy has doubled, or possibly trebled, in value since July 5, 1912. This increase in value has resulted from the demand for it for residence purposes, and that demand did not arise until the improved facilities for travel between the property and the city made the property available and desirable for residences. No one knew on July 5, 1912, that this would occur, nor could anyone have more than conjectured the extent values would be affected if he had known in advance just what improvements in travel facilities were going to be made. So we see nothing in the "changed character of the property and its increase in value" to make the contract illegal or its specific performance unjust or inequitable.

It remains only to be determined whether the appellants abandoned the contract. The master did not find, from the evidence, that appellants abandoned the contract and were not entitled to ask its performance. The substance of the evidence on this subject was as follows: Charles E. Brown's death occurred seven days after the contract was executed and before he had furnished appellants the abstract of title. After his death his son, Harold E., procured from the Chicago Title and Trust Company the abstract,

and it was by him or A. M. Cross, the attorney representing the Browns, delivered to H. P. Sinden, appellants' attorney, on the 29th of July, 1912. Sinden was informed by Cross that he (Cross) was going away on his vacation; that he would return about the first of September, and it would be satisfactory if Sinden had his opinion as to the title ready at that time. Cross returned about the first of September and on the seventh communicated with Sinden and received from him an opinion, in which a number of irregularities in the title were pointed out. Cross inquired whether appellants intended to stand upon the irregularities or defects pointed out, and was first told by Sinden that there were some matters he wished to look into, and later, in the latter part of September, Sinden informed Cross that appellants would waive the questions raised as to the regularity of the title and carry out the contract for the purchase of the property. Cross raised the question as to how the deed was to be executed, and expressed the view that as the widow had not signed the contract and the children were minors they could not make a deed or consent to anything. This was stated to appellants by Cross at his office, where they had called to inform him they were willing to carry out the contract and desired to do so. Cross suggested to appellants that they confer with their attorney, Sinden, and be governed by his advice as to what method should be adopted to carry out the contract and give them title to the property. He stated to the appellants that Mrs. Brown was willing to perform the contract but the obstacle in the way was that the children were minors. Subsequently Cross and Sinden had an interview, in which Sinden said his clients were anxious to carry out the contract. Cross suggested there was no hurry about it, as no title could be made until Charles E. Brown's estate had been closed in the probate court and it was ascertained what, if any, claims were proved against it. Cross and Sinden discussed the proposition of a public sale upon the petition of

the guardian of the children. Later Sinden told Cross he thought the guardianship sale was the best method of getting the title into appellants. The question then occurred, and was discussed between the parties, that such a sale would be a public sale, at which any person could bid, and someone might bid more than the contract price. The two lawyers were inclined to think there was not much danger of this, as the widow would be entitled to homestead and dower in the premises, which she would or could refuse to release to any purchaser except appellants. No definite decision was arrived at, however, but it appears to have been the opinion of both Sinden and Cross that no title could be made to appellants until the Brown estate had been closed in the probate court, and, so far as is disclosed by the evidence, it was decided by counsel for the respective parties to let the matter rest until that time. The evidence is clear and conclusive that appellants expressed their willingness, readiness and desire at all times to perform their part of the contract. Cross, attorney for Mrs. Brown, represented to appellants that she was willing at all times to carry out the contract. Neither Cross nor Sinden ever had his attention called to the provision of the statute relating to the performance of a contract made by a decedent, by the executor or administrator. No letters of administration were issued until October 4, 1912, when Mrs. Brown took out letters of administration upon her husband's estate. Whether time was of the essence of the contract or not,—and it was not expressly made so,—appellees were in no position to perform the contract until letters of administration had been granted, and appellants could not be put in default before that time. They had, however, before that time shown their willingness and desire to perform the contract and never at any time indicated any other intention or desire. They did not make the cash payment or tender it, nor pay the taxes on the land, because, as they claim, Cross advised that it was unnecessary to make these payments until the

contract could be carried out on the other side. On October 9, 1913, the widow of Charles E. Brown, on behalf of herself and the heirs, notified appellants in writing that they had elected to rescind and declare the contract void, and expressing their willingness to return to appellants the $500 earnest money paid by them to Brown, with interest at five per cent from the date of its payment, upon the receipt of a release of the contract by appellants. Mrs. Brown was discharged as administratrix October 21, 1913. On November 6, 1913, Mrs. Brown filed the original bill in this case.

It is beyond dispute that the testimony shows appellants always intended to perform the contract and insisted upon its performance. This, indeed, is not denied by appellees, but the contention is that through the advice of Sinden appellants abandoned the contract signed by Charles E. Brown and sought to obtain the title through a guardian's sale. We think this is untenable. Appellants never at any time abandoned, or intimated an intention of abandoning, their rights under and by virtue of the contract. They had contracted with the owner for the title to the land, and always expressed their willingness and readiness to carry out their part of the agreement. After Brown's death there was no one with whom they could carry out their part of the contract until the administratrix was appointed, October 4, 1912. Before this was done appellants had called upon counsel who represented Mrs. Brown, and their attorney had also called upon her counsel and stated they were ready and willing to perform the contract. That the contract could not be carried out on the part of the Browns until a year after letters of administration had been granted appears to have been first suggested by the attorney who then represented Mrs. Brown. It is true the attorneys for the respective parties discussed the proposition of what method would be adopted even then to get the title in appellants, as the Brown children were minors. The attorneys for both parties appeared to be of opinion that the sale upon the ap-

plication of a guardian would be the best plan. This was not intended as an abandonment of the contract and cannot be so considered. The plan talked over was one for the performance of the contract and securing to the respective parties the rights they were entitled to under it. It was not within the power of appellees to rescind the contract or declare it forfeited until appellants were in default, and in our opinion there is an utter lack of evidence to show any default that would justify rescinding or forfeiting the contract. *Cohen* v. *Segal,* 253 Ill. 34; *Zempel* v. *Hughes,* 235 id. 424; *Hills* v. *McMunn,* 232 id. 488; *Watson* v. *White,* 152 id. 364; *Glover* v. *Fisher,* 11 id. 666.

There are no circumstances of an oppressive or inequitable nature attending the enforcement of the performance of this contract that would justify a court of equity in exercising its discretion and denying the enforcement of specific performance. (*Cumberledge* v. *Brooks,* 235 Ill. 249; *Anderson* v. *Anderson,* 251 id. 415.) The master and chancellor were of opinion the property was worth about $25,000 at the time the contract was made, but that opinion was not supported by the proof, which, as we have said, showed $18,000 to have been the fair cash market value at the time the contract was made. No fraud is charged to have been practiced by appellants, and, so far as disclosed by the evidence, Charles E. Brown was in as good a position to know the then present and future value of the land as appellants. It does not appear that either Brown or appellants knew of the improvements in travel facilities that were later made within a year and which were the cause of the increase in value. If these improvements had not been made there is nothing to show that anything else would have caused the increase in value. It has never been held that where a contract is made for the sale of land at its fair cash value, and before the completion of the contract improvements in the vicinity are made which increase the value of the land, this would justify the vendor in refusing

to carry out the contract or a court of equity in refusing to compel him to do so. This case is in many respects like *Anderson* v. *Anderson, supra,* and the rules and principles announced in that case apply here. In our opinion appellants are entitled to the specific performance of the contract.

The decree of the superior court is therefore reversed and the cause remanded to that court, with directions to deny the prayer of the original bill for the cancellation, as a cloud upon the title, of the contract for the sale of said five and a fraction acres to appellants and to decree specific performance of the contract under the prayer of the crossbill, subject to such homestead and dower rights as the widow, Matilda Brown, may be entitled to.

*Reversed and remanded, with directions.*