(No. 11390.—Decree modified and affirmed.)

JOHN F. ADAMS, Appellee, *vs.* ANNIE LARSON, Appellant.

*Opinion filed June 21, 1917.*

1. SPECIFIC PERFORMANCE—*whether specific performance will be granted depends largely on the facts of each case.* Even where the terms of a contract are clear, certain and unambiguous, specific performance is not a matter of right but rests in the sound discretion of the court, to be exercised largely according to the facts and circumstances of each case.

2. SAME—*mere change in value of property will not prevent enforcement of contract.* The fact that there may have been a rise in the value of property or that one person may have gotten the better of a trade, if there are no inequitable circumstances, will not prevent the enforcement of a contract.

3. SAME—*when fact that agent acts for both parties will not defeat specific performance.* Where an agent of the vendor is in the secret employment of the purchaser a contract made between the principal and purchaser through the agent's efforts is not binding

upon the principal, and that fact is a good defense to a bill for specific performance; but such is not the case where it is known that the agent is acting for both parties and there is no proof tending to show falsehood or misrepresentation.

4. PRINCIPAL AND AGENT—*when an agent may act for two parties.* Where a dual agency is disclosed to a known principal the agent may act for both parties and the agency cannot be questioned; and the same is true where the interests of the two parties do not conflict and where loyalty to one is not a breach of duty to the other.

APPEAL from the Superior Court of Cook county; the Hon. DENIS E. SULLIVAN, Judge, presiding.

ANDERSON, ANDERSON & ANDERSON, for appellant.

WILLIAM M. & WILLIAM S. JOHNSTON, (JOHN J. ROONEY, of counsel,) for appellee.

Mr. CHIEF JUSTICE CARTER delivered the opinion of the court:

Appellee, John F. Adams, filed a bill in the superior court of Cook county March 17, 1915, for the specific performance of a contract for the conveyance to him by appellant, Annie Larson, of two lots and improvements thereon located on the north side in the city of Chicago, at the corner of Glenwood avenue and Arthur street. The matter was referred to a master in chancery, who heard the testimony and recommended a decree for specific performance. The trial court thereafter entered a decree approving the report of the master and ordering appellant within ten days to perform her contract and deliver to appellee a complete merchantable abstract of title or merchantable title guaranty policy and outlining certain other requirements as to perfecting title, etc., and including a general decree for specific performance. The case has been brought to this court on appeal.

The property in question consists of two fifty-foot lots improved with an eight-room residence, built by appellant's

husband about eleven years before the contract was exe-
cuted. The appellant, who was a widow, resided on the
premises with three children and a grandchild. The con-
tract provided for the sale of the real estate to appellee for
$10,000, on terms therein stated. The chief question in dis-
pute is as to the circumstances connected with the execu-
tion of the contract. Paul A. Finley, of the real estate
firm of Finley & McGuire, negotiated the sale. He testified
that he first met Mrs. Larson about a year and a half be-
fore, when he asked her whether her house was for sale,
and she stated it was not but might be later; that about
nine days before this contract was executed, appellee, John
F. Adams, who was a department manager in a wholesale
grocery firm, came to Finley's office and stated that he was
interested in buying in the vicinity of this property and in-
quired if he had any property for sale. Finley testified
that he told him that perhaps Mrs. Larson would want to
sell her place and suggested that he look at it; that Adams
returned in a short time and stated that he would like to
buy it and asked Finley to get a price on it, and the latter
went to appellant and she said she might sell but would not
take less than $10,000; that Finley told her he had a party
but did not know whether he would consider it at that price;
that Finley communicated that price to Adams, who said
that he would not give it but would give $9000. Finley
testified that he then asked Mrs. Larson if she wanted to
sell for that amount and she said she did not; that within
a day or two he came back to see her with an offer from
Adams of $9500, which she refused, stating that her price
was $10,000; that during some of these interviews there
was talk with her about moving the house off, but she stated
it would not pay; that after a second interview with Mrs.
Larson Finley reported to Adams that she would not take
less than $10,000 and wanted to remain on the premises
until April 30, rent free; that Adams finally consented to
having a contract drawn for $10,000, which was prepared

in Finley's office and signed by Adams, who also gave at the same time a check for $250 as first payment, payable to Mrs. Larson. Finley further testified that he then went to Mrs. Larson and told her that he had finally gotten appellee to execute the contract at her price of $10,000; that he told her he wanted her to understand everything in the contract, and she sat down and read the contract over with him, and they discussed the amount of cash ($4000) to be paid down, a mortgage to be given back to her on the premises for the balance, and the question of commissions and the unpaid installments of special assessments on the property, which, according to Finley's testimony, were to be paid by Mrs. Larson; that she sent her daughter for pen and ink, and Finley inserted, at her request, the provision for free rent until April 30, which he had overlooked when the contract was drafted; that she read it over again and he asked her if she was satisfied, and she said she was; that she signed the contract and indorsed the check, which it was understood he was to hold, and that he took the check with him and deposited it. He also testified to certain of their conversations during these negotiations with reference to her buying or renting an apartment; that she said she preferred to rent for a time; that after she had signed the contract she said nothing further to him about the transaction, except that she came to his office the next day and asked for a copy of the contract, and he had one written out by his stenographer and gave it to her; that shortly thereafter William R. Anderson, one of the firm of attorneys representing appellant in this case, called up Finley's office and later talked with him personally in regard to the matter. The substance of their conversation, which was admitted in evidence subject to objection, was that Anderson explained that for sentimental reasons Mrs. Larson did not care to go ahead with the contract; that she had lived there quite a while and had formed an attachment for the place; that he (Finley) told Anderson he had shown

Mrs. Larson's signature to Adams and it would be for Adams to say whether or not she could be released; that Anderson asked him if he would come down to his office so he could compare the copy of the contract with the original; that he did so, at which time Anderson repeated what he had said about Mrs. Larson for sentimental reasons not wanting to go ahead with the contract; that he told Anderson he did not think Adams would cancel the contract, and Anderson said then Adams would have to fight, as Mrs. Larson did not intend to carry it out; that Anderson told him if the contract was canceled he (Finley) would not lose anything as the result. This witness, on cross-examination, testified that he thought this property would increase to some extent in value; that he explained this to appellant during the negotiations, but told her what increase there would be from year to year would not be likely to amount to as much as the interest on the $9500, or thereabouts, that Adams had then offered for the property. He also testified that he thought the property would go up $25 or $30 a foot, but that it would only be worth that amount for one who wanted to build an apartment building on it. McGuire, Finley's partner, corroborated Finley's testimony as to the telephone conversation with Anderson, and also testified he thought the property, including the buildings, was worth at the time of the contract between $8000 and $9000. Another real estate witness testified for appellee that he thought the property was worth from $90 to $100 a foot. Appellee, Adams, corroborated Finley as to requesting the latter to find out what the property could be purchased for, as to the different offers he asked Finley to make for him, and as to appellee finally signing the contract for $10,000 and making the check for $250. Adams testified that he had never had any conversation with Mrs. Larson but dealt entirely through Finley. It appears, also, from the testimony in the record, that Finley told Adams that the property would be purchased clear of the unpaid special assessment

installments, but the contract was drawn and executed the other way, so that Adams had to assume the unpaid installments; that it was Finley's mistake, and that if the contract was carried through, Finley would have to pay these assessments himself and as a result would not make anything on the trade, as these installments were as much, or a little more, than his commissions.

Appellant testified that she was a widow, fifty-seven years of age, at the time of the trial, with very little business experience; that she had been very nervous since her husband's death; that the first time she remembered seeing Finley was some time in January, 1915, when he called and asked what she valued her property at, and she then told him she did not want to sell but stated that her neighbors were asking $100 a foot, and she thought her land was worth as much; that Finley came again in a day or two and said he had a buyer for $10,000; that she again told him she did not want to sell, as it was a home given to her by her husband and built by him before his death; that he told her property was liable to drop in value, but she still persisted that she did not intend to sell. She testified, also, to several other occasions in the next few days when Finley called to see her and that she told him she did not want to sell; that he suggested on one of those visits that she could rent a flat near the church she attended, but she told him she wanted to remain there in her own home; that the day she signed the paper Finley again told her that he thought she ought to sell for $10,000, but she refused again; that at that visit he handed her a paper which he told her he would like to have her sign and asked for pen and ink, stating that if she would sign her name he would have something to work on; that she did not know what she was signing at the time, as he did not tell her what the paper was and she did not read it over; that she asked her widowed daughter, Mrs. Giesey, who was in the house at the time, to bring pen and ink and signed the paper; that Fin-

ley left immediately and she suffered a nervous collapse all the rest of the day; that the next day she saw her attorney, Anderson, and told him she had signed some paper as to her property and he advised her to get a copy of it, which she did and took to his office.' She denied that Finley showed her a check, or that he had made offers of $9000 and $9500 for her property, or had said anything about the cash amount to be received or the mortgage to be given back to secure her for the balance of the purchase money. She testified that she had owned other real estate which she had sold, and that she had received the proceeds of such sale since her husband's death and had taken a mortgage, upon which she received interest; that she also owned some bank stock, from which she received dividends of about $600 a year. From Mrs. Larson's testimony it is clear that when she first talked to her attorney, Anderson, she knew she had signed some paper with reference to her home property, but she asserted she did not know it was a contract until Anderson told her that fact.

Gustaf Hallbom testified for appellant that he had been the executor of her husband's estate and had conducted some business for her since; that she was not a business woman and had spells of nervousness; that she told him after she had sold the property here in question that she had made a mistake, because she had no idea as to what she was signing. Her daughter, Mrs. Ruth Giesey, a widow with one small child, living at appellant's home, also testified as to her mother's nervous condition since Larson's death and that she thought her mother was getting worse; that she was the one who got the pen and ink from the kitchen, and that she heard Finley tell her mother to sign the paper and that he then would have something to work on; that she did not see any check. It is also clear from the evidence that Mrs. Giesey was in the house during most of the interviews of Finley with appellant.

Dr. McClellan testified to having treated appellant for neurasthenia and mucous colitis; that she had suffered from the first trouble ever since he had known her and that it would affect the strength of her mind and will; that her condition in that regard was such that she required treatment; that mucous colitis was a congested condition of the large bowel, characterized by certain nervous symptoms; that a neurasthenic will very readily yield to suggestions from other people. The doctor did not remember the dates he had treated appellant, but stated that a neurasthenic may be unable to transact business at a certain time and calm again an hour after.

It is clear from the record, we think, that appellant indorsed the $250 check given by Adams as the first payment on the purchase money, although she testified she did not remember anything about seeing the check before, but as we understand the record she does not deny that her signature was indorsed thereon. It is also plain that her daughter was in the house at the time she executed the contract and knew what Finley was trying to get Mrs. Larson to do. It is asserted also by counsel for appellee in his brief that appellant had a grown son residing with her at the time, but while the evidence shows that she had a son living with her the record does not show his age at the time. The master reported, and the trial court found, that Finley had not in any way deceived appellant or been guilty of fraud in getting the contract executed, and we think the weight of the evidence tends to support this conclusion.

Whether the specific performance of a contract will be granted depends largely upon the facts of each case. Even where the terms of the contract are clear, certain and unambiguous, specific performance is not a matter of right but rests in the sound discretion of the court, to be determined from all the facts and circumstances. (*Sugar* v. *Froehlich,* 229 Ill. 397; *Espert* v. *Wilson,* 190 id. 629.) But when there is no oppression or fraud in the execution of a con-

tract, courts of equity will enforce the contract to sell land if understandingly entered into. In such a case the discretion of the court cannot be used to defeat specific performance. Judicial discretion in enforcing a contract for specific performance is not arbitrary or capricious but is governed by settled principles of equity. (*Brown* v. *Brown,* 274 Ill. 325; *Cumberledge* v. *Brooks,* 235 id. 249; *Anderson* v. *Anderson,* 251 id. 415.) The fact that there may have been a rise in the value of the property or that one person may have gotten the better of a trade, if there are no inequitable circumstances, will not prevent the enforcement of a contract. *Zempel* v. *Hughes,* 235 Ill. 424; *Brown* v. *Brown, supra.*

As we understand the argument of counsel for appellant, they seem to concede there was no misrepresentation as to the contract itself, and neither is there any proof in behalf of appellant that the property did not sell for what it was fairly worth at the time, but it is argued that appellant was not in condition to make the contract. While her daughter and Dr. McClellan testified as to appellant's nervous trouble and the necessity for treatment for the same, there is also evidence that she transacted practically all of her business after her husband's death and up to the time she entered into this contract. We think, also, it is clear from her testimony, taken in connection with all the other testimony, that she fixed her own price as to the value of this property and that such price was the consideration inserted in the contract. As a matter of fact, the contract would seem to be even more favorable to her as to the unpaid special assessments than Finley's testimony as to what she agreed to. There can be no other conclusion from the evidence in the record than that she understood, in substance, what the paper was that she was signing. She knew, without question, that it had to do with the sale of her home, and if she was willing to sign a paper to give Finley "something to work on" toward selling the home, it is

difficult to believe that she was at that time unwilling to
make the actual sale. Her testimony on this point is not
entirely consistent. All the circumstances connected with
this transaction tend strongly to support the testimony of
Finley with reference to the history of these negotiations
between himself and appellant as to the sale of the prop-
erty. From all the testimony in the record we are con-
vinced that the statement of her attorney to Finley is cor-
rect that the reason she did not want to carry out the con-
tract was because of her desire, for sentimental reasons,
to keep the home.

Counsel for appellant further contend that Finley acted
as agent for both parties without the knowledge or consent
of appellant, and that therefore Mrs. Larson could rescind
the contract for that reason. When an agent is in the secret
employment of the purchaser, a contract made between the
principal and purchaser through the agent's efforts is not
binding upon the principal, and that fact is a good defense
to a bill for specific performance. (2 Mechem on Agency,—
2d ed.—sec. 2138, and note; see, also, *Fish* v. *Leser,* 69
Ill. 394.) While Finley admitted that he represented both
parties in causing this contract to be executed, it does not
appear to have been in the sense that he was being paid a
commission by each of them. It is clear there was no other
agent in the matter and that both parties acted through him.
Mrs. Larson fixed a price on her place, Finley communi-
cated the offer to Adams, and Adams, after considerable
negotiations, accepted her figure and the contract was drawn
on that basis. We cannot see anything in this record that
shows that Finley acted in any way inconsistent with his
duty toward the appellant or concealed anything from her.
Where it is known that the agent acts for both parties and
there is no proof tending to show falsehood or misrepresen-
tation, such service is all that either party has reason to
expect. (1 Mechem on Agency,—3d ed.—sec. 1592.) The
law is well settled that where the dual agency is disclosed

to the principal the agent may act for both and the agency cannot be questioned. (*Aiple-Hemmelmann Real Estate Co.* v. *Spelbrink,* (Mo.) 14 Ann. Cas. 652.) Where the interests of the two parties do not conflict and where loyalty to one is not a breach of duty to the other an agent may act for both parties. (1 Am. & Eng. Ency. of Law,— 2d ed.—1074; 2 Ency. of Law & Pr. 1056; 2 Corpus Juris, 693.) In *Law* v. *Ware,* 238 Ill. 360, it was held that where one fixed his own price and that price was accepted, the complainant in the suit could not complain if the agent divided commissions with the seller's agent. In this case there was no proof of double commissions or secret representation of the purchaser. Indeed, as already stated, Finley has testified in this case against his own interest. If the contract is carried out he will lose his commissions in making good to appellee the unpaid installments of special assessments.

The record does not disclose that appellant was under any financial stress which would affect her decision to sell the property speedily at a price less than its real value or that her relations with Finley were such that he would have an undue influence over her. There is nothing in her testimony or that of her daughter to show that Finley attempted to use any unfair means or deceived her in any way before she executed the contract.

We think the evidence justified the decree, and finding no errors of law in the record the decree will be affirmed. The decree, as to the times for carrying out the various steps therein provided for, is necessarily modified so as to figure from the date the mandate herein is filed in the trial court instead of figuring from the date of entry of said decree.                    *Decree modified and affirmed.*