Edward H. Trabue, Defendant in Error, v. Robert L. Bowman, Plaintiff in Error.

Gen. No. 8,315.

332

Opinion filed April 22, 1930.

FRANK A. WHITESIDE, GILLESPIE, BURKE & GILLESPIE and HUGH G. DOBBS, for plaintiff in error.

THOMAS HENSHAW, GREEN & VERLIE and CHAPMAN & DU HADWAY, for defendant in error; JACK MCDONALD, of counsel.

MR. JUSTICE NIEHAUS delivered the opinion of the court.

The defendant in error, Edward H. Trabue, filed a motion in this case to dismiss the writ of error herein, or in the alternative to transfer the cause to the Supreme Court, contending that a freehold is involved in the determination of the issues. Upon a careful consideration of the right of the defendant in error to have the case transferred to the Supreme Court, we have reached the conclusion, that a freehold is not directly involved in the determination of the question of right to specific performance; and the motion is therefore denied.

Concerning the facts involved in this controversy the record discloses that the plaintiff in error, Robert L. Bowman, on or about the 20th day of May in the year 1920 executed a written agreement or contract with the defendant in error, Edward H. Trabue, for the purchase of 160 acres of land situated in

Greene county, which adjoined the farm of 320 acres already owned by the plaintiff in error.

The written agreement which constitutes the contract of sale entered into, is as follows:

"Agreement—Sale of Real Estate.

"This Indenture, made this 20th day of May A. D. 1920, between Edward H. Trabue, party of the first part, and Robert L. Bowman, party of the second part,

"Witnesseth, That the party of the first part has this day sold to the party of the second part the following described property, to-wit:

The N½ and the SW¼ of SW¼ and S½ of S½ of NW¼ of Section 31, Town. 11 N,

Range 10 West in Greene County, Illinois, together with all appurtenances thereto belonging and now thereon, for which the party of the second part agrees to pay the sum of sixty-four thousand and 00/100 dollars ($64,000.00), payable as follows: Cash in hand thirteen hundred and 00/100 dollars, receipt whereof is hereby acknowledged. Balance note for four thousand dollars, payable March 1st, 1921, the receipt whereof is hereby acknowledged and the balance March 1st, 1921 ($58,700.00). The above mentioned note to be without interest until maturity.

"The party of the first part is to furnish to the party of the second part, or assigns, a warranty deed and a good and sufficient abstract of title, showing a good title of record to the premises hereinafter described in the party of the first part on or before March 1st, 1921, assign all insurance on said buildings, pay all taxes and assessments against said real estate, and if there is a mortgage on said property, pay interest and taxes thereon up to March 1st, 1921, and give possession by March 1st, 1921. It is mutually agreed that time is an essential element in this contract, and it is further agreed that in case either of

the parties hereto fail to perform the stipulations of this contract, or any part of the same, the failing party shall pay to the other party of this contract the sum of fifty-three hundred dollars ($5,300.00) as damages for nonfulfillment of contract.

"In Testimony Whereof, the parties aforesaid have subscribed their names the date above mentioned.

Robert L. Bowman,

Second Party.

Edward H. Trabue,

First Party.

Witness:

Carson T. Metcalf."

After the execution of the written agreement, the plaintiff in error paid the cash payment of $1,300, and afterwards, also paid the $4,000 note payable on March 1, 1921, but did not make payment of the $58,700 balance, which was to be due on the purchase price of the land on March 1, 1921. The record discloses that the defendant in error, after making tender of a deed and abstract, and an offer to comply with his part of the agreement, and after plaintiff in error's refusal to accept the same, filed a bill in the circuit court of Greene county, for specific performance of the contract of sale, to enforce the payment of the balance alleged to be due and payable under the contract. A demurrer was filed to the bill of complaint, which was sustained by the court. On appeal, this court reversed the order of the court sustaining the demurrer and dismissing the bill, and remanded the cause with directions to overrule the demurrer. The reasons for reversing and remanding the cause are stated in the opinion of this court, namely, that: "the question before the court upon this appeal is not whether after a full hearing a court of equity should decree specific performance. The only question before us is, does

the bill upon its face state a cause of action calling for the intervention of a court of chancery." *Trabue v. Bowman,* 227 Ill. App. 622.

After reinstatement of the case in the court below, the plaintiff in error filed his answer to the bill, and in the answer he avers his defense to be as follows: "This defendant avers that he did enter into negotiations on and prior to the 20th of May, 1920, with A. H. Haven and Carson T. Metcalf, who were then and there the agents of the complainant, which negotiations culminated in a verbal contract or agreement between this defendant and said agents by which this defendant agreed to purchase the premises described in said bill for the sum of $64,000 on March 1, 1921, or to forfeit and pay as an option on said premises the sum of $5,300; and this defendant avers that it was expressly and distinctly understood between him and the agents of said complainant that in case he did not see fit to carry out the contract of sale and to pay the said sum of $64,000.00, that he would be relieved from all obligations under said contract by the payment to the complainant of the sum of $5,300 as provided for in the contract. . . . And this defendant avers that when he signed said written memorandum of sale he understood and believed that said memorandum gave him the option of either accepting the complainant's deed to the premises and paying the full price of $64,000.00 therefor, or of declining to accept said premises by paying the sum of $1,300 cash payment, which he then and there made, and his said note for $4,000 in full of said option." It is also averred, as a matter of defense, "that it would have been impossible for the defendant on the 1st day of March, 1921 and ever since that time, to have paid to the complainant the sum of $62,700 balance of the purchase price of said premises, for the reason that this defendant did not then, or has he since had, or

been able to obtain that amount of money. That the property had at that time and has ever since been so depreciated that it has been impossible for this defendant to have borrowed the said sum of $62,700; that all the property owned by this defendant and said property described in said memorandum of agreement would not have been considered sufficient in value to secure the payment of said sum of $62,700, and that the defendant was then and there and has ever since been wholly unable to obtain the said sum of $62,700.'' The matter of the depreciation of the value of the land purchased above stated is not available to the plaintiff in error as a defense to a decree of specific performance. *Adams v. Larson,* 279 Ill. 268.

A hearing was had upon the issues raised by the bill and answer; and the court thereupon entered a decree to compel the plaintiff in error to perform his part of the contract by making payment of the balance of the purchase price of the land sold to him by the defendant in error. This writ of error is prosecuted from the decree.

The evidence discloses that the defendant in error made sale of the land in question through the agency of A. H. Haven and Haven's partner, Carson T. Metcalf; and that the plaintiff in error entered into negotiations with these agents for the purchase of the land; and that the negotiations culminated in an agreement with the plaintiff in error for the purchase of the land in question by him, for the sum of $64,000 or $400 per acre, with the understanding, however, that the plaintiff in error had an option to refuse to complete the sale to him and to be released from the payment of a balance of $58,700 purchase money due on March 1, 1921, by forfeiting the first payments made amounting to the sum of $5,300; and a written contract was then prepared by Metcalf representing the defendant in error to embody the terms of sale and to include the option mentioned; and this contract was signed by the

plaintiff in error with the understanding that the contract as written did not contain the option mentioned. And Metcalf testified at the hearing that he intended in preparing the contract to embody in the agreement arrived at between him and the plaintiff in error regarding the alleged option; and that he told the plaintiff in error that under the contract he would have the option.

The plaintiff in error's testimony concerning the transaction is as follows: "The talk I had with Mr. Haven before I entered into that written agreement was, I asked him if they had it listed, and he said, 'no, not yet, but I think we will have pretty soon.' Before the trade was made he said, 'we have our contract with Mr. Trabue, and we will have to sell it for $64,000.' Q. What was said about the terms of the trade? A. Well, he says 'you will have to see Mr. Metcalf about the terms of the contract,' and so when they got the contract ready Mr. Metcalf called me up and says, 'the contract for the sale of that land is ready to be signed.' I went in, and in reading it over I saw where it says, $1,300 cash and a note for $4,000 to be paid the next March. Well, I says to him, 'what about this $1,300 being cash?' I was a little suspicious. He says, 'that is the way Mr. Trabue wants it.' . . . And he says, 'this $1,300 is to cover the commission and the $4,000 is a forfeit provided you do not want to take the place,' and he emphasized that 'in case anything happened, you do not take the place, you will lose the forfeit, and it will be all right according to the contract.' . . . I negotiated for the sale of the land with Mr. Haven. He said, 'Metcalf and I are together, and he will explain the contract.' . . . Mr. Metcalf prepared the contract. Before the contract was signed he told me if I decided not to take the place before the 1st of March it would cost me $5,300. . . . At the time I entered into this contract, and pending the negotiations for the purchase of the land, I en-

tered into it with the understanding and agreement that I was to have the right to forfeit $5,300 and not comply, or have to take the place. . . . Q. What did Mr. Carson Metcalf tell you about it before you signed this paper? . . . A. He told me the $1,300 was to cover the commissions and $4,000 was forfeit money, if I concluded for any reason, I didn't want to take the place. . . . I would not have entered into any positive agreement without reservations to have taken that place at $64,000, when I knew I would have to borrow $50,000. . . . Mr. Metcalf knew I would have to borrow that much. At the time I signed my name to that memorandum or agreement of sale marked 'Exhibit B,' I was informed by Mr. Carson Metcalf that if I decided not to take the place it would cost me $5,300, $1,300 in cash and the $4,000 note.''

The testimony of Metcalf, who conducted the final negotiations for the sale of the lands for the defendant in error, and prepared the written contract concerning the terms of sale agreed upon, is as follows: ''Q. In your negotiations with Mr. Bowman, in your talks with Mr. Bowman, up until the time this contract was signed, what did you tell him about his option he would have, about his right to forfeit a certain amount and refuse to take it before the 1st of March, in case he refused to take it? . . . A. I told Bowman $4,000 was asked as a forfeit. Q. What did you tell him, if anything, about his right, if he saw fit not to carry out the terms of the contract, what it would cost him at the time of the contract marked 'Exhibit B' was signed? . . . A. I phoned Bowman that the contract was ready for signatures. He came in, I read it to him and explained the condition of the $1,300 more than he had originally intended as a forfeiture. I says, 'that means if you don't take the farm, you will lose this $1,300 you are paying today, and you will have to pay the note which you are giving for $4,000 balance.' He said, 'all right' and signed his

name and executed the note. I wrote the note myself on the typewriter and prepared the contract which was read over to Mr. Bowman. In preparing that contract, it was my intention to provide an option there that could be taken up and the rest of the contract abrogated. Mr. Trabue had insisted on $5,300 being the amount of the payment. $1,300 would take care of the commission, which it did, and $20 more, leaving the $4,000 note as in the original agent's contract. This $4,000 note was to be paid in any event, whether Bowman took the land or not.''

The evidence shows, that after the execution of the contract, the plaintiff in error in good faith made an earnest and energetic effort to procure the balance of the money which he was required to pay on March 1, 1921; but owing to the general and rapid decline in farm land values and the financial stringency prevailing in the money market, he was unable to procure the amount necessary for that purpose, even by mortgaging his 312-acre farm with the 160 acres purchased. The financial difficulties which had arisen is emphasized by the defendant in error's refusal to aid the plaintiff in error in completing his purchase except as required by the written agreement. And this is apparent from the defendant in error's own testimony. The record discloses that after making repeated attempts to borrow money, the plaintiff in error went to the defendant in error, to ascertain if he would accept a $50,000 mortgage instead of the cash necessary to enable him to complete his purchase; but the defendant in error refused to consider this proposal. His testimony on this point is as follows: ''He (the plaintiff in error) met me on the road one day when I was going out for a load and asked me if I would leave $50,000 in the place, and take a mortgage; that money was pretty scarce. I told him I would like to take that into consideration. The next day I met him and asked him how much would the mortgage cover. He said the whole farm,

meaning the 160 acres I had sold him, and the 320 he already owned. I asked him how long he wanted it. He said for just one year. I told him this was not according to the contract and I would rather not do it." After he found his efforts to raise the requisite amount of money unavailing the plaintiff in error notified the defendant in error that he would exercise the option not to take the farm which he claimed to have under the contract, by forfeiting the $5,300 which he had paid.

It is contended by the defendant in error that the contract which is the basis of the bill of complaint, praying for specific performance, is clear and definite in its terms; and that there is no evidence of any fraud or false representations in procuring its execution; and therefore the case presented is a proper one for the exercise of the jurisdiction of a court of equity, to enforce specific performance. The rule concerning the right of a complainant to resort to a court of equity to enforce specific performance of the contract is well settled; and has been repeatedly and clearly defined by our Supreme Court. In *Adams v. Larson,* 279 Ill. 268, the rule is stated as follows: "Whether the specific performance of a contract will be granted depends largely upon the facts of each case. Even where the terms of the contract are clear, certain and unambiguous, specific performance is not a matter of right, but rests in the sound discretion of the court, to be determined from all the facts and circumstances. *Sugar v. Froehlich,* 229 Ill. 397; *Espert v. Wilson,* 190 Ill. 629. But when there is no oppression or fraud in the execution of a contract, courts of equity will enforce the contract to sell land if *understandingly* entered into." And in *Edwards v. Brown,* 308 Ill. 350, the court makes the same comment concerning the general rule: "Whether the specific performance of a contract will be granted depends in a large measure upon the facts and circumstances in the case. Even where the terms

of the contract are clear, certain and unambiguous, specific performance is not a matter of right, but rests in the sound discretion of the court, to be determined from all the facts and circumstances.'' And in *Mc-Donald v. Bartlett,* 324 Ill. 549, the latest expression of the court on the subject is as follows: ''It is only on the principle that it is unjust and inequitable to permit a contract to remain unexecuted that a court of equity will grant relief by way of specific performance. *Wisherd v. Bollinger,* 293 Ill. 357; *Thackaberry v. Tibbe,* 284 Ill. 199.''

It is also contended by the defendant in error that the evidence introduced on the hearing concerning the negotiations for the sale of the land to the plaintiff in error and the verbal understanding and agreement arrived at by the parties in consummation of the sale, which were to be embodied in the written agreement, was not competent, and cannot legally be considered to determine the question of the defendant in error's right to specific performance of the written contract. This evidence was properly admitted; and is competent to show the facts and circumstances connected with the transaction between the parties for the sale of the land, which resulted in the contract in question. The same point was under consideration in the case of *Race v. Weston,* 86 Ill. 91; and the court there said: ''That parol evidence of the circumstances connected with the transaction, and the declared intention of the parties, in executing the writing, is admissible for the purpose of showing fraud, accident, or mistake, is as well established as any other principle governing courts of equity in such cases.'' The parol evidence of the circumstances connected with the transaction of the sale of the land in question, and the declared intention of the parties involved in the transaction leaves no room for doubting that the written agreement or contract was drawn for the purpose of effectuating what had been verbally agreed upon concerning

the option claimed by the plaintiff in error, namely, that by suffering a forfeiture of the $5,300 paid on the purchase of the land he would be released from the further obligation of paying the balance of the purchase price and taking the land. Mr. Metcalf's statement that he aimed to express the plaintiff in error's option in the contract, and that the contract did contain this option in its terms is not without foundation when the contract is examined, bearing in mind Metcalf's statement. It will be noticed that by the terms of the contract two balances are stated in the contract. One balance was to make up the sum of $5,300, the amount of the forfeiture in the contract; and then another balance, namely, the amount to be paid to complête the amound of the purchase price for the land. It is a reasonable inference that the contract was worded in the manner indicated to show the first balance which the plaintiff in error would have to pay in case he desired to exercise his option to forfeit the $5,300; and the other balance, to indicate the amount remaining to be paid in case the sale of the land was completed.

It is quite clear from the evidence that the plaintiff in error in the light of Metcalf's statement that the contract expressed his option, interpreted the contract in that way; and it cannot therefore be said that the plaintiff in error executed the contract understanding that defendant in error would have the right under its terms after paying the amount due on forfeiture, to compel him to pay the balance of $58,700 and take the land. Metcalf was intrusted by the defendant in error to make sale of the land, and he is bound by what Metcalf did and said, and the representations made to the plaintiff in error to effectuate such sale, and to obtain his signature to the contract for that purpose, to the same extent as if he had personally carried on such negotiations and had written the contract himself. What was pointed out by the court in

the case of *Rockford, R. I. & St. L. R. Co. v. Shunick,* 65 Ill. 223, is particularly applicable here: "The appellant could not seek to take the fruits of the contract without adopting the means by which it was obtained."

And under the facts and circumstances disclosed by the record, we conclude that the defendant in error is estopped to deny that the plaintiff in error had the right to the option claimed by him. "The true principle of sound ethics is to give the contract the sense in which the person making the promise believed the other party to have accepted it if he in fact did so understand and accept." *Wells v. Carpenter,* 65 Ill. 447. "Where the contract is in fact understood by one of the parties in a certain sense, and the other party knows that he so understands it, then the understanding is to be taken in that sense, provided this can be done without making a new contract for the parties." *Street v. Chicago Wharfing & Storage Co.,* 157 Ill. 605; *The Snead & Co. Iron Works v. Merchants Loan & Trust Co.,* 225 Ill. 442. But what was said by the court in *Bayne v. Cinak,* 320 Ill. 23, is also applicable on the question of the defendant in error's right to enforce specific performance: "Complainants are seeking to enforce specific performance of the contract. Whether that remedy shall be granted or not, in many cases rests in the sound discretion of the court. A contract to sell land, fairly and understandingly entered into, will be enforced as a matter of right, but where there are circumstances of misrepresentation, misapprehension or mistake which would make the enforcement of the contract oppressive or unjust, it will not be enforced. *Keating v. Frint,* 291 Ill. 423, and cases there cited."

For the reasons stated, we conclude that the defendant in error is not entitled to a decree for specific performance; and the decree is therefore reversed.

*Reversed.*