East Peoria Elevator Company, Plaintiff-Appellant, v. Geo. W. Cole Grain Co., and Margaret B. Wrigley, Executor of the Will of Bernard E. Wrigley, Deceased, Defendants-Appellees.

Gen. No. 11,109.

Second District, First Division.
September 11, 1958.
Rehearing denied October 20, 1958.
Released for publication October 20, 1958.

Morgan, Pendarvis & Morgan, of Peoria (John M. Niehous, Jr., of counsel) for appellant.

Kavanagh, McLaughlin & Bond, of Peoria (E. D. McLaughlin, of counsel) for appellee.

PRESIDING JUSTICE DOVE delivered the opinion of the court.

The complaint in this case was filed on February 2, 1951, by the East Peoria Elevator Company, a corporation, against the George W. Cole Grain Company, a corporation, and Margaret B. Wrigley, as executor of the Will of Bernard E. Wrigley, deceased.

On February 4, 1955, the complaint was amended and, as amended, the plaintiff sought to recover a judgment against the Cole Grain Company requiring it to account to the plaintiff for all moneys received by it for rental of grain storage space in plaintiff's elevator and for judgment for the amount found due the plaintiff upon such accounting. The amended complaint also sought an accounting and money judgment against Margaret B. Wrigley, as executor of the Will of Bernard E. Wrigley, deceased, for all moneys paid by lessees of grain storage space in plaintiff's elevator which was intended for the plaintiff and which Bernard Wrigley allegedly wrongfully diverted to others.

After answers and replies were filed the issues thus made were referred to a special master. The cause was heard by the special master upon the evidence offered

84

by the respective parties and upon a stipulation of facts. The special master recommended that a decree be entered dismissing the complaint as amended for want of equity. Objections to this report were filed and overruled by the special master and upon a hearing before the chancellor upon exceptions to the special master's report, all exceptions were overruled, the report approved, and a decree rendered dismissing the amended complaint for want of equity at the costs of the plaintiff. To reverse that decree plaintiff appeals.

It appears from the evidence and the stipulation of the parties that the plaintiff is an Illinois corporation, having its principal office and elevator in Peoria, Illinois. It operated a public warehouse designed solely for the storage, handling, treatment and drying of grain and for the receipt and delivery of grain by railroad. Its warehouse had a capacity of 905,000 bushels of corn, oats, wheat and soybeans and as the operator of a class "B" public warehouse, it was subject to the Public Warehouse Act and also to the rules and regulations of the Illinois Commerce Commission.

Defendant, George W. Cole Grain Company, is also an Illinois corporation, with its principal office and place of business in the Board of Trade Building at Peoria, Illinois. During the period in question this company was doing business as a grain brokerage or commission house and held a seat on the Peoria Board of Trade and bought and sold all types of grain for its customers and also for its own account and regularly rented storage space of the plaintiff and from time to time had annual contracts for storage space with the plaintiff.

Bernard E. Wrigley was president and principal owner of the Cole Grain Company and he operated it and several country elevators located in Illinois. He was active in the daily buying and selling of grain for his companies and their customers. The offices of the

Cole Grain Company were in the Board of Trade Building in Peoria and Mr. Wrigley handled the business affairs of that company from those offices.

From 1940 until his death, which occurred on March 31, 1950 Bernard Wrigley was the assistant manager and treasurer of the plaintiff and from 1944 until his death he was its vice-president. He was the sole active manager of the day to day affairs of the plaintiff and handled all its business affairs from his office at the Cole Grain Company offices in the Board of Trade Building in Peoria.

Della M. Herring was for many years, cashier of the plaintiff and upon Mr. Wrigley's death in 1950, she was elected to succeed him as treasurer of the plaintiff. She had also worked directly under Wrigley's supervision as cashier or bookkeeper for the Cole Grain Company and was familiar with the way Mr. Wrigley conducted the business of the plaintiff and the business of Cole Grain Company. At various times the Cole Grain Company and also Mr. Wrigley, individually advanced money to the plaintiff and a running account between these two companies was kept by Mr. Wrigley.

For many years the Elevator Company had entered into contracts with various customers for specified amounts of storage space based upon an annual rate established by the Elevator's tariffs. While the record does not show the amount of storage space leased to Cole Grain Company prior to July 1, 1949, it does show that as early as 1933 it had entered into such contracts with Cole Grain Company and from 1940 it had entered into similar storage contracts with Terminal Grain Company.

On July 1, 1949 the Elevator Company and the Cole Grain Company entered into a contract for 100,000 bushels of storage. On July 29, 1949, the amount was increased to 150,000 bushels and on October 8, 1949, it was increased to 225,000 bushels. On July 27, 1949, a

similar 100,000 bushel storage contract was entered into by the Elevator Company and the Terminal Grain Company, and on October 21, 1949, the amount of storage for Terminal Grain Company was increased to 140,000 bushels. These contracts provided for the payment of the Elevator's tariff for annual storage which was $12,000 for 200,000 bushels and also contained this clause: "Said space shall be used by party of the second part (lessee) only for the storage grain owned by the party of the second part and it shall not use such storage space, or any part thereof, for storage of grain owned by others, and it shall not directly, or indirectly, operate a warehouse business for the storage of grain of others."

The record discloses that during the latter part of June, 1946, the Cole Grain Company entered into a contract effective July 1, 1946, with Corn Products Refining Company which had been one of its largest customers since 1918. This contract designated the Refining Company as "Buyer" and the Cole Grain Company as "Seller." It recited that the contract was made expressly for the purpose of storing at any one time a maximum of 200,000 bushels of corn or other grains belonging to the Corn Products Refining Company in the elevator of the plaintiff in space which the Cole Grain Company had leased of the plaintiff. This contract also recited that the plaintiff acted as warehouseman and not the seller; that the period of storage under this contract covered two years beginning July 1, 1946, and provided for a minimum rental charge of $18,000 for space per year payable semi-annually in advance beginning July 1, 1946. The contract also obligated Corn Products Refining Company to pay the established rates prescribed for drying and for treatment of grain and for other elevator services. This contract was executed on behalf of the Cole Grain Company by Wrigley, who was its then president, and by

Della M. Herring, its then secretary and a rider was attached thereto consenting to its execution, which rider was signed, "East Peoria Elevator, by B. E. Wrigley, Treas."

Under this contract between Cole Grain Company and Corn Products Refining Company the Refining Company issued checks aggregating $39,636.65 in various amounts and at different times between June 29, 1946, and April 26, 1948. Four of these checks, each for $9,000 and each marked "for storage" and one check for $2,036.60 marked for "excess elevation" were made payable to the order of Cole Grain Company. These five checks aggregate $38,036.60. The four checks each for $9,000 were endorsed by Wrigley and credited to the account of the Cole Grain Company and Wrigley endorsed the $2,036.60 check and it was credited to the account of the Terminal Grain Company. The balance of $1,600.05, which represents the difference between $39,636.65 and said sum of $38.036.60 is the aggregate amount of five checks issued by the Refining Company and payable to the Elevator Company. Two of these checks aggregating $741.72 and marked "drying" and "excess storage," respectively, were deposited to the credit of the Elevator Company. The other three checks aggregating $858.33 were endorsed and credited to the account of Cole Grain Company. To recapitulate: of the $39,636.65 received by Wrigley from Corn Products Refining Company under its contract with the Cole Grain Company, $36,858.33 went to the credit of the Cole Grain Company; $741.72 was placed to the credit of the Elevator Company and $2,036.60 was placed to the credit of Terminal Grain Company. As a part of the same transaction Wrigley drew a check on the Cole Grain Company account for $15,224.02 and this was placed to the credit of the Terminal Grain Company, so that ultimately Terminal Grain Company received $17,260.62, the Cole Grain

88

Company $21,634.31 and the Elevator Company $741.72.

With reference to this transaction the amended complaint charged that plaintiff, Elevator, had leased to the Cole Grain Company storage space sufficient to contain at one time 225,000 bushels of grain for an agreed annual rental of $13,500 and had also leased to the Terminal Grain Company storage space sufficient to contain 150,000 bushels of grain for an agreed annual rental of $9,000 per year; that these leases contained the restrictive covenant above set forth which precluded the lessees from using the space it had leased from plaintiff for the storage of grain belonging to any one other than the lessees; that Wrigley, on behalf of the Cole Grain Company, entered into an agreement with Corn Products Refining Company for the storage of 200,000 bushels of grain in plaintiff's elevator for two years beginning, July 1, 1946, at an annual charge of $18,000 per year, payable semi-annually in advance; that Wrigley caused a rider to be attached to said agreement which recited: "For and in consideration of $1.00 and other good and valuable consideration in hand paid, the receipt whereof is hereby acknowledged, East Peoria Elevator hereby agrees and consents to the foregoing agreement" and that said rider was signed; "East Peoria Elevator by B. E. Wrigley, Treas."; that this agreement between the Cole Grain Company and the Corn Products Refining Company violated the restrictive covenant in the contract between the Elevator Company and the Cole Grain Company and that the Elevator Company did not authorize Wrigley to execute this consent. The amended complaint then concluded that Wrigley, as manager and as an officer of the Elevator Company abused the confidence reposed in him and used his position as managing officer, to divert moneys which plaintiff should have received to the use of the Cole Grain Company and demanded that

the Cole Grain Company and the executor of the Will of Bernard E. Wrigley should account to plaintiff for all sums paid Cole Grain Company under this contract which became effective on July 1, 1946.

The provisions of the contract between the Cole Grain Company and the Refining Company differ materially from the standard provisions of the annual storage contracts between the plaintiff and the Cole Grain Company. The storage contracts between the plaintiff and its lessee do not assume that the lessee would use the leased space for the storage of the same grain during the full term of the lease. These contracts contemplate that the grain originally stored will be removed and replaced by other grain during the term of the lease and provide that the Elevator would transfer, i. e., load in and out of its elevator, four times the amounts of the authorized annual storage without any additional charge, and that for such "transfer" in excess of that amount, an additional charge of one half cent per bushel, on merchantable grain, would be paid.

Each of these standard form annual storage contracts further provided that no part of the annual charge would be refunded if the lessee fails to use any part of the leased space at any time during the term of the lease. Such provision is not contained in the agreement between the Cole Grain Company and the Refining Company. That contract, however, does provide that for the "elevation" of more than 200,000 bushels of grain during the term of the contract, the Buyer will pay to the Seller an additional sum of one-half cent per bushel for the first 200,000 bushels of excess grain handled, and one-cent per bushel for any additional grain handled by the Seller for the Buyer. This provision was clearly intended to indemnify the Cole Grain Company, against any additional rental charges which it might incur to the plaintiff, under the provisions of its leases with the plaintiff, if the "trans-

90

fer" of grain made by the plaintiff, as a result of the Refining Company contract, exceeded the amount of the "transfers" authorized by its annual rental contracts with the plaintiff. The agreement between the Cole Grain Company and the Refining Company further expressly provided that if it became necessary that any of the grain purchased by the Refining Company and stored in plaintiff's elevator, be conditioned by the plaintiff, it would also pay to the plaintiff its regular tariff charges for conditioning such grain.

The Corn Products Refining Company was a consumer of large quantities of grain. Its contract effective July 1, 1946, recited that the contract was made expressly for the purpose of storing a maximum of 200,000 bushels of grain in space under lease in plaintiff's elevator to the Cole Grain Company and that the Refining Company would have the privilege of keeping that quantity of grain in store in said elevator at all times during the life of the contract. The Refining Company was designated "Buyer" in this contract and Cole Grain Company was referred to as "Seller." Payment for grain sold to Buyer by Seller for storage in plaintiff's elevator was to be made against delivery of the Elevator Company's warehouse receipt and upon all grains covered by such receipts Buyer agreed to carry full insurance coverage.

The Cole Grain Company had no right to operate a public warehouse but it did have the authority to buy and sell grain and to lease storage space in a public warehouse. Its contract with the Refining Company disclaims any intention to act as a warehouseman but it did agree to hold in store, in plaintiff's elevator, all grain ordered into store by the Refining Company until the Refining Company gave the Cole Grain Company loading instructions. The grain while in storage, whether bought for the Refining Company by the Cole Grain Company or whether purchased by some other

supplier was the property of the Refining Company and that company and the Cole Grain Company had a right to enter into such a contract had it not been for the provision in the contract the Elevator Company had with the Cole Grain Company to the effect that the space leased by the Elevator Company to the Cole Grain Company should be used only for the storage of grain owned by the Cole Grain Company.

When Mr. Wrigley executed the Elevator-Cole Grain Company contract on behalf of the Elevator Company he acted as its agent. In executing the same contract on behalf of Cole Grain Company he was acting as its agent and when he executed the contract on behalf of the Cole Grain Company with the Refining Company he was agent of the Cole Grain Company and when he appended to the bottom of that contract the consent of the Elevator Company to that agreement he was acting as an agent and officer of the Elevator Company.

The restrictive provisions in the contract between the Elevator Company and the Cole Grain Company were violated by the provisions of the contract between the Cole Grain Company and the Refining Company. The Elevator Company was a public utility. It could not have entered into any contract with the Refining Company or the Cole Grain Company containing the provisions which were embraced in the contract entered into by the Cole Grain Company and the Refining Company. That contract required the Refining Company to pay the Cole Grain Company $12,000 more than it would have been required to pay the Elevator Company under its scheduled tariffs for the same space. The Cole Grain Company received $36,000 for storage space which cost it $24,000. Mr. Wrigley was the active managing officer of the Elevator Company and because of his connection with that company he was able to assure the Refining Company that the re-

quired storage space for grain which the Cole Grain Company purchased for the Refining Company would be available in plaintiff's elevator. Wrigley's position in the Elevator Company was such that the Refining Company would be warranted in relying upon this assurance.

It was stipulated upon the hearing that no officer, director or employee of the Elevator Company except Wrigley and Della M. Herring knew of any payment to, receipt by, or retention by the Cole Grain Company of any sums of money on account of the storage of grain of the Refining Company in plaintiff's elevator until shortly prior to the commencement of this proceeding and it was further stipulated that no officer, director or employee of the Elevator Company except Wrigley and Della M. Herring knew of any contract between the Cole Grain Company and the Refining Company for the storage of grain in plaintiff's elevator until shortly prior to the commencement of this action.

Adams v. Larson, 279 Ill. 268, was a suit for specific performance brought by John F. Adams against Annie Larson. It appeared that Paul Finley was a real estate agent and he was contacted by John A. Adams who was interested in buying the dwelling house owned and occupied by Mrs. Larson. Finley contacted Mrs. Larson who told him she would not take less than $10,000 for the property and wished to remain on the premises until April 20, rent free. After considerable negotiations Mrs. Larson signed the contract prepared by Finley which had been previously signed by Adams and accepted a check of Mr. Adams for $250 as a first payment. It was insisted by counsel for Mrs. Larson that Finley acted as agent for both parties without her consent and therefore she could rescind the contract for that reason. In affirming the decree of the superior court which directed specific performance of the contract the Supreme Court said: (p. 297) "While Finley

admitted that he represented both parties in causing this contract to be executed, it does not appear to have been in the sense that he was being paid a commission by each of them. It is clear that there was no other agent in the matter and that both parties acted through him. Mrs. Larson fixed a price on her place, Finley communicated the offer to Adams, and Adams, after considerable negotiations, accepted her figure and the contract was drawn on that basis. We cannot see anything in this record that shows that Finley acted in any way inconsistent with his duty toward the appellant or concealed anything from her. Where it is known that the agent acts for both parties and there is no proof tending to show falsehood or misrepresentation, such service is all that either party has reason to expect. (1 Mechem on Agency, 3rd ed.—sec. 1592.) The law is well settled that where the dual agency is disclosed to the principal, the agent may act for both and the agency cannot be questioned (Aiple Hemmelmann Real Estate Co. v. Spelbrink, (Mo.) 14 Am. Cas. 652). Where the interests of the two parties do not conflict and where the loyalty to one is not a breach of duty to the other an agent may act for both parties."

The author of the article on Agency in 3 C. J. S. Sec. 165, pp. 53, 54, 55 states that as a general rule it is a breach of good faith and loyalty to his principal for an agent, while the agency exists, to deal with the subject matter thereof so as to make a profit out of it for himself in excess of his lawful compensation and, if he does, he may be held as a trustee and may be compelled to account to his principal for all profits acquired by him in such dealings whether in performance of or in violation of his duties, unless the principal has consented to or ratified the transaction knowing that benefit or profit would accrue or had accrued to the agent. "The application of this rule," continues the text, "is

94

not affected by the fact that the principal did not suffer any injury by reason of the agents dealings."

In James T. Hair Co. v. Daily, 161 Ill. 379 at page 386 it is said that the principal is entitled to the full benefit of whatever profit is derived by the agent in the course of the business of his principal and if profits were made in the course of the business the principal should have the benefit.

In the instant case the officers and directors of the plaintiff knew that Wrigley was the principal stockholder and active managing officer of the Cole Grain Company but, other than Wrigley and Della Herring none of the other officers of the plaintiff had any knowledge of, or information concerning, the contract the Cole Grain Company had with the Refining Company or concerning the payments made by the Refining Company to the Cole Grain Company until shortly prior to the commencement of this suit. Wrigley was never authorized by plaintiff to consent, in its behalf, to the execution of this contract. When he, on behalf of the Cole Grain Company, entered into its contract with the Refining Company, he violated the provisions of plaintiff's contract with Cole Grain Company. He acted without authority when he assented on behalf of the plaintiff to the contract of the Cole Grain Company with the Refining Company. Wrigley also concealed from the plaintiff the fact that Cole Grain Company was actually receiving $18,000 annually for the same amount of space in plaintiff's elevator for which Cole Grain Company was paying plaintiff $12,000 annually.

Bernard E. Wrigley was the agent of and acted for the Elevator Company and was authorized by the board of directors to transact all the business of the plaintiff. He was specifically authorized to endorse checks for deposit to the elevator's account and while the record discloses that the plaintiff has received the full amount due for all services which it rendered the Refining Company it also shows that in addition to the

storage checks issued by the Refining Company aggregating $36,000 payable to the Cole Grain Company, Wrigley also received three checks aggregating $858.33 payable to the plaintiff. These three checks were endorsed by Wrigley and credited to the Cole Grain Company. In the absence of any evidence explaining this procedure Cole Grain Company should account to plaintiff for the proceeds of these checks, viz.: one dated February 3, 1948 for $755.74, one dated April 23, 1948, for $15.59 and one dated April 25, 1948, for $87 together with 5% interest from these respective dates.

■■ Mr. Wrigley's connection with the Cole Grain Company was known to plaintiff and the Cole Grain Company knew of Wrigley's connection with the plaintiff. The law required Wrigley to act in entire good faith toward his principals and he could not use his position as agent for either company to obtain any benefit for one of his companies which were, in any manner, detrimental to the rights and interests of the other company. Under the facts appearing in this record the Elevator Company is entitled to recover from the defendants, Margaret B. Wrigley, executor of the Will of Bernard E. Wrigley, deceased and the Cole Grain Company the sum of $858.33 with interest as above indicated and in addition the sum of $3,000 with 5% interest computed from July 6, 1946; $3,000 with 5% interest computed from January 14, 1947; $3,000 with 5% interest computed from July 3, 1947 and the further sum of $3,000 with 5% interest computed from January 8, 1948, these dates being the respective dates these several amounts were paid by the Refining Company and placed by Wrigley to the credit of the Cole Grain Company.

The complaint charged that the money which Wrigley received from the Refining Company and which he paid over to the Terminal Grain Company was intended for the plaintiff. Wrigley did receive a check

drawn by the Refining Company for $2,036.60 but it was payable to the Cole Grain Company and not the Elevator Company. Wrigley did, on behalf of the payee, endorse it and place it to the credit of the Terminal Grain Company. Wrigley also on behalf of the Cole Grain Company issued a check for $15,224.02 which he placed to the credit of Terminal Grain Company. The Terminal Grain Company is not a party to this proceeding and no relief is sought against it and the Cole Grain Company is seeking no relief against the Terminal Grain Company and the Refining Company is not a party to this proceeding or seeking any relief.

For all services rendered by plaintiff to the Refining Company the record shows plaintiff has received full payment and there is no charge that the Cole Grain Company ever failed to pay plaintiff the rentals and all charges due it under the provisions of its annual storage contracts. Nor does it appear that any part of the amount which Wrigley placed to the credit of the Terminal Grain Company was not proper or that any portion of it was intended for the plaintiff.

■■■■■■ While there is nothing in the record which would warrant a finding that any amount received by Wrigley from the Refining Company was retained by him personally or converted to his own use, the law is that all profits made and advantage gained by an agent in the execution of the agency belong to the principal and it does not matter whether such profit or advantage gained be the result of the performance or of the violation of the duty of the agent, if it be the fruit of the agency. An agent is also liable to his principal if he does not properly account for all funds that come into his hands as agent during the course of the agency, and the Cole Grain Company is liable because it received funds wrongfully diverted by Wrigley from the plaintiff with knowledge of such wrongful diversion.

(1 Ill. Law and Practice, title agency, secs. 72, 73, 75 and 77.)

The complaint as amended alleged that during the years 1949 and 1950 the Commodity Credit Corporation stored quantities of grain in plaintiff's elevator and in payment for said storage issued its checks to plaintiff for $149,628.97; that all of said payments were intended for the plaintiff but that the plaintiff actually received only $59,173.49. It was then alleged that Wrigley wrongfully endorsed in blank the several checks issued by the Commodity Credit Corporation which were intended for the plaintiff and deposited such checks to the bank account of the Cole Grain Company or delivered the same to the Terminal Grain Company.

The answer of the defendants admitted that the Commodity Credit Corporation stored large quantities of grain in plaintiff's elevator and admitted that certain portions of checks received from the Commodity Credit Corporation and payable to plaintiff were delivered to the Cole Grain Company and that certain portions of said checks were delivered to the Terminal Grain Company. The answer denied, however, that such transfers or payments were wrongful and averred that they were made in payment of sums of money actually due and owing the Cole Grain Company and the Terminal Grain Company and denied that any payments due and owing to the plaintiff from the Commodity Credit Corporation were not received and retained by the plaintiff.

Upon the hearing it was stipulated that during the years 1949 and 1950 plaintiff operated its elevator as a government warehouse and that the Commodity Credit Corporation, a government agency, entered into agreements with the plaintiff for the storage, in plaintiff's elevator of an unknown quantity of grain for

98

specified periods, and at specified rates, and that these agreements were executed either by Wrigley or by Della M. Herring on behalf of the plaintiff. It was further stipulated that pursuant to these contracts large quantities of grain were shipped by the Commodity Credit Corporation to plaintiff by freight collect; that upon the arrival of said grain the Cole Grain Company, acting by Wrigley, paid the freight, weighing and inspection charges with funds belonging to the Cole Grain Company; that when checks were issued by the Commodity Credit Corporation for reimbursement for freight, weighing, inspection and insurance, these checks were made payable to plaintiff and were received either by Wrigley or Della M. Herring who endorsed them on behalf of the plaintiff and the proceeds were placed to the credit of Cole Grain Company and retained by the Cole Grain Company. It was further stipulated that the checks in payment for storage charges issued by the Commodity Credit Corporation were received by Wrigley or Della M. Herring who endorsed them and they were placed to the credit of the Cole Grain Company. The stipulation then states that "the proceeds of the checks in payment of storage charges were apportioned among George W. Cole Grain Company, Terminal Grain Company and East Peoria Elevator Company either by endorsing and depositing the checks to the bank credit of East Peoria Elevator Company, or by endorsing and delivering the checks to Terminal Grain Company or by endorsing and delivering the checks to the credit of George W. Cole Grain Company and either retaining that credit in full or distributing some or all of it to East Peoria Elevator Company or Terminal Grain Company."

It was further stipulated that during the period beginning July 22, 1949 and ending July 28, 1950 the Commodity Credit Corporation issued sixteen checks all payable to the plaintiff and aggregating $123,545.-

.99

54; two of these checks totaling $18,654.02 were deposited by Wrigley to the account of the plaintiff; the remaining fourteen checks aggregating $104,891.52 were endorsed by Wrigley or Della M. Herring and deposited to the credit of the Cole Grain Company. Of this amount Cole Grain Company paid plaintiff $19,750.44 and paid the Terminal Grain Company $37,177.18. Of the total amount of $123,545.54 received by Wrigley from the Commodity Credit Corporation, plaintiff eventually received $38,404.46, Terminal Grain Company received $37,177.18 and the Cole Grain Company received $47,963.90.

It was further stipulated that during this period the Cole Grain Company purchased from the Commodity Credit Corporation grain in storage in plaintiff's elevator in the amount of $43,604.37 and that the Cole Grain Company paid plaintiff as rental for its contract space the sum of $20,481.44 and during the same period Terminal Grain Company paid the plaintiff as rental for its contract space the sum of $23,499.68.

It was further stipulated that between May 19, 1949, and July 6, 1950, the Cole Grain Company paid one hundred eighty different items or accounts for and on behalf of the plaintiff aggregating $181,044.50. These payments or advancements were repaid by the plaintiff to the Cole Grain Company. All the transactions were handled on behalf of both companies by Wrigley. It was further stipulated that between October 15, 1947, and March 31, 1950, the Cole Grain Company advanced to plaintiff cash on eleven occasions aggregating $21,750, which amount was repaid by plaintiff between December 30, 1949, and August 1, 1950.

Counsel for plaintiff insist that the plaintiff was the company which rendered all of the services and furnished the storage to the Commodity Credit Corporation in connection with this transaction; that every check issued by the Commodity Credit Corporation

100

was payable to the order of plaintiff; that Wrigley had authority to receive these checks, endorse them and place them to the credit of the plaintiff; that these checks aggregated $123,545.54 and of this amount plaintiff's account was credited with $38,404.46, leaving $85,141.08, which never found its way into the hands of the plaintiff but which the stipulation says was apportioned in payment of storage to the Terminal Grain Company and the Cole Grain Company, the Terminal Grain Company receiving $37,177.18 and the Cole Grain Company receiving $47,963.90. Counsel contend, therefore, that plaintiff is entitled to recover in this proceeding so far as this transaction is concerned said sum of $85,141.08 together with interest thereon.

The position of defendants, as stated by their counsel, is that Wrigley owed as great a duty to the Cole Grain Company as he owed the Elevator Company; that the government was not obliged under its contract to keep its grain in storage except from day to day while other lessees were compelled to pay storage for a full year even though portions of the space was not used for weeks or months; that the government got a special rate and did not pay the regular contract rate of $6,000 a year on a 100,000 bushel contract; that during the month of June 1950 the Cole Grain Company only had 2,000 bushels of grain in storage and the Terminal Grain Company had not to exceed 28,600 bushels and for a part of the month had nothing in storage. The contracts of these two firms, however, plus the grain of the Commodity Credit Corporation during this period, varied from 837,432 bushels to 956,594 bushels. "What then did Wrigley do when suddenly these great quantities of grain of the Commodity Credit Corporation were dumped in upon him?" inquires counsel, and this is their answer: "First of all, he took money of the Cole Grain Company and paid

freight and inspection charges as these cars of grain arrived. The plaintiff had neither money or credit with which to pay these charges. Between October 15, 1949, and March 31, 1950, Wrigley paid out of the funds of the Cole Grain Company to meet the pay roll of the plaintiff $21,750 and between May 18, 1949, and June 13, 1950, Wrigley took funds of the Cole Grain Company amounting to $181,044.50 to pay incoming freight and inspection charges. Why did he do this? In the early stages of these transactions Wrigley saw the opportunity of gaining business for the plaintiff— it had no funds—it had no credit—but the defendant corporation had both.

"As the sole managing head of defendant corporation and also of the plaintiff, he felt it right and proper to loan funds of this defendant for the benefit of the plaintiff and this he did. There was no possibility of profit in the early stages of this transaction. Wrigley exercised his own judgment. He thought it was right, fair and proper to make these advances for the plaintiff and he thought the chance of repayment from the Commodity Credit Corporation was good. He was not thinking of any profit for the defendant corporation, but only for the plaintiff. Later as these quantities of grain increased and continued, it became evident that the plaintiff could not accept this grain except by utilizing the storage space of Terminal and the defendant corporation. When he went out of free space he went to Terminal and asked it frankly to release or lease back a part of its space to the plaintiff so that it could take care of the quantities of grain being supplied by the Commodity Credit Corporation. Very naturally the Terminal could see no reason why it should release the plaintiff from its contract solely because Wrigley asked it to. Some arrangement by negotiation had to be worked out; and it resulted in an arrangement whereby Terminal had a chance to make

102

a profit on its lease-back space, dependent upon the length of time the Commodity Corporation left its grain in the warehouse.

"As the quantities of grain of the Commodity Credit Corporation continued to roll in, it was necessary for Wrigley to take back part of the space from the defendant corporation. Was it fair to Cole for Wrigley to give back Cole space without compensation just to help the Plaintiff? Or was it right that the plaintiff should lease-back from the defendant corporation on the same basis that had been worked out by negotiation with Terminal? The similarity in the net amounts which Terminal and Cole retained out of these checks substantiates the conclusion that the rate paid Cole for the lease-back was the same as that paid Terminal. It is true that the defendant corporation made a profit on that deal but was it dishonest, unreasonable or improper?

"Why weren't the Commodity Credit Corporation checks deposited to the plaintiff's account? Wrigley is dead and cannot speak for himself; but very possibly it was because Cole had advanced large freight and inspection charges for Commodity Credit Corporation grain which it would have been illegal for the plaintiff to advance. It would hardly seem proper for such charges to appear on the books of the plaintiff. The record proves that the plaintiff received every dime to which it was entitled or which it could legally charge; that Wrigley's loyalty to the plaintiff is amply proven by the large sums of money he advanced from the funds of the defendant corporation to keep the plaintiff in business and to enable it to accept the Commodity Credit Corporation grain and make a profit thereon. That the defendant corporation also made a profit on the transaction worked no injury to the plaintiff."

This argument was adopted by the special master who found that the Cole Grain Company and Terminal

Grain Company had each surrendered to the Commodity Credit Corporation portions of space in plaintiff's elevator which these companies had leased of the plaintiff and that these payments to the Cole Grain Company and the Terminal Grain Company were intended to reimburse these companies for the loss of the use of space in plaintiff's elevator which they were entitled to use under the provisions of their annual contracts with the plaintiff and that there was nothing in the evidence showing that the distribution of the checks of Commodity Credit Corporation was not in strict accordance with the rights of the parties to the transaction, although the master stated that no evidence was offered to show the terms upon which either the Cole Grain Company or the Terminal Grain Company surrendered their leased storage space in plaintiff's elevator to the plaintiff in order to enable it to use such space for the storage of the grain of Commodity Credit Corporation.

With reference to the Corn Products Refining Company transaction the special master found that there was nothing in the evidence or stipulation which disclosed why any part of the proceeds of that contract should have been paid to the Terminal Grain Company but the fact that payments were so made suggested (1) that the Cole Grain Company found it to be necessary to use space in plaintiff's elevator then under lease to terminal Grain Company to discharge its obligation to the Refining Company under its contract; or (2) that there was some agreement with the Terminal Grain Company authorizing such use of such space which is not shown by the evidence; or (3) that the Cole Grain Company used a part of the proceeds of such contract to discharge some other obligation to Terminal Grain Company. These are simply surmises. The fact is that there is absolutely nothing in the evidence which shows why any part of the proceeds of the

money received from Commodity Credit Corporation should have been paid to either Cole Grain Company or Terminal Grain Company.

■■ The parties stipulated that from time to time plaintiff was indebted to the Cole Grain Company for advances made by the Cole Grain Company for the plaintiff but the stipulation was that all such indebtedness was paid. In our opinion the record does not support the finding that the checks drawn by Commodity Credit Corporation and delivered to Wrigley and by him placed to the credit of the Cole Grain Company and Terminal Grain Company were intended to reimburse these companies for loss of use of space in plaintiff's elevator. The record shows that with the exception of a few days there was ample space during the period involved in this proceeding, available in plaintiff's elevator to store the grain of Commodity Credit Corporation and leave untouched the space leased by plaintiff to Cole Grain Company and to Terminal Grain Company. Even if they were, Wrigley exceeded his authority in endorsing and delivering them to these companies and when it is shown that he did this very thing the burden of proving the legality of the transaction is cast upon defendants. To meet this requirement counsel for appellees state: "The fact that Wrigley endorsed certain checks made payable to the plaintiff and deposited them in the bank to the credit of the defendant corporation or endorsed and delivered them to the Terminal Grain Company was a mere matter of form, since in the distribution of the proceeds thereof, the plaintiff received all money to which it was legally or justly entitled." We do not agree.

How can it be seriously contended that it was just a matter of form for Wrigley who was authorized to receive checks for his principal, the Elevator Company, endorse them and place them to the credit of his principal, to receive from Commodity Credit Corporation

105

fourteen checks aggregating $104,891.52, payable to his principal, endorse those checks and cause them not to be deposited to the credit of his principal, the payee therein, but to the defendant corporation, Cole Grain Company?

██ If the proceeds of these checks or any part thereof were intended for or belonged to either the Cole Grain Company or the Terminal Grain Company, Wrigley could have placed them to the credit of the Elevator Company as he was authorized to do and then drawn checks on that account and thus discharge any valid obligation due from the plaintiff to either Cole Grain Company or Terminal Grain Company and there would then have been a full and complete record reflecting the transaction. It is true that equity looks to the substance and not the form of a transaction but just what Wrigley did in connection with the transactions involved in this proceeding was stipulated. Of course there is no presumption that he violated the trust and confidence reposed in him by the plaintiff but in the light of the facts revealed by this record his personal representative and the Cole Grain Company must be held to account to his principal, the plaintiff.

██ It might be further observed that the record discloses that Della Herring was called by the defendants as a witness. She had had complete charge of the bookkeeping for both the Elevator Company and the Cole Grain Company during the period covered by the transactions herein referred to but she was not asked any questions which threw any light upon the material issues presented by this record. No one connected with Terminal Grain Company testified. The theory advanced by counsel for defendants in support of their contentions is not supported by the evidence found in this record. The facts are clear and not controverted. What we said about Mr. Wrigley in connection with the Corn Products Refining Company transaction ap-

106

plies equally to his transaction with the Commodity Credit Corporation transaction. He personally did not retain any of the funds nor did he convert the proceeds of any check to his own use. He did exceed the authority vested in him by his principal the Elevator Company. He diverted the proceeds of fourteen checks, $104,891.52, to the Cole Grain Company which in turn paid plaintiff $19,750.44 leaving $85,141.08 with interest thereon for which the defendants should account to the plaintiff.

The decree of the circuit court of Peoria County is reversed and this cause is remanded to that court with directions to enter a decree in favor of the plaintiff and against the defendants consistent with the views expressed herein.

Reversed and remanded with directions.

McNEAL and SPIVEY, JJ., concur.

ON PETITION FOR REHEARING.

In appellees' petition for rehearing it is suggested that inasmuch as Bernard E. Wrigley was the agent of and acted for the Elevator Company and was authorized to transact the business of this company the court erroneously concluded that he did not have authority to consent on behalf of the Elevator Company to the provisions of the Cole Grain Company contract with the Corn Products Refining Company. It is also urged that in requiring the Cole Grain Company and the Wrigley Estate to account to the Elevator Company for the difference in the storage charge which Cole Grain Company collected from the Refining Company and the amount which the Cole Grain Company paid to the Elevator Company the court permits the Elevator Company to collect storage charges in excess of its legal tariff.

107

Mr. Wrigley was authorized to transact business for the Elevator Company but he was not authorized to lease to the Cole Grain Company a substantial amount of storage space in the Elevator for the legal tariff and then acting for the Cole Grain Company lease the same space to the Refining Company for a substantial higher amount than the legal tariff. The fact that as a result thereof the Elevator Company will now receive storage charges in excess of its published tariff is not a matter of which either the Cole Grain Company or the personal representative of the Wrigley Estate can complain.

It is also stated that to permit the Elevator Company to collect from Commodity Credit Corporation and others for the use of space under lease to Terminal Grain Company and for the use of space under lease to Cole Grain Company will result in permitting the Elevator Company to collect from two companies for the same space. Counsel then continues: "If East Peoria Elevator Company used storage space which was under lease to Cole Grain Company or Terminal Grain Company, either with, or without permission of such lessees, then such lessee is entitled to be reimbursed in accordance with its arrangement with the Elevator Company on a quantum meruit basis and it therefore became the duty of Wrigley to reimburse Cole Grain Company and Terminal Grain Company for the use of such space." These conclusions are based upon the assumption that the Commodity Credit Corporation used space leased by the Elevator Company to Terminal Grain Company and to Cole Grain Company. We adhere to our holding that the evidence in this record does not warrant these conclusions.

Rehearing denied.

McNEAL and SPIVEY, JJ., concur.